Rorer et al. v. Zoning Board of Adjustment

*Thomas B. Moreland Porter, Jr.*, for appellants.
*High, Swartz, Childs & Roberts*, for borough.
*Wisler, Pearlstine, Talone & Gerber*, for intervenor.

FORREST, J., August 4, 1955.—This is an appeal from the decision of the Zoning Board of Adjustment of the Borough of North Wales granting a variance from the terms of the zoning ordinance of the borough whereby applicants, John F. Neary, Jr., and Alseina Neary, his wife, the owners of a certain property, have been permitted to erect a building thereon for the extension of a nonconforming use, to wit, the breeding of mice and rats for laboratory purposes.

The zoning board held a hearing and made findings of fact upon which its decision was predicated. However, the notes of testimony before the board were not transcribed. Therefore, it appeared that the presentation of testimony in court was necessary for the proper disposition of the appeal. The taking of such evidence was authorized by the Act of May 4, 1927, P. L. 519, section 3307, as amended by the the Act of July 10, 1947, P. L. 1621, section 93, 53 PS §15211.7. On appeal from the refusal of a variance by the board the Supreme Court stated in a recent decision that the "Court of Common Pleas had the power to hear the appeal and likewise had the power to hear evidence and to make such decision as, under the evidence and the applicable principles of law, was just and proper": Pincus v. Power, 376 Pa. 175, 179 (1954). See also concurring opinion by Bell, J., in Walker v. Zoning Board of Adjustment et al., 380 Pa. 228, 235 (1955).

From the testimony we make the following

*Findings of Fact*

1. Applicants, John F. Neary, Jr. and Alseina Neary, his wife, reside in a twin house situate at 623 East Walnut Street, North Wales, Montgomery County, having acquired title to said premises in 1946. The premises have a frontage of approximately 72 feet and a depth of 150 feet.

2. John F. Neary, Jr. is employed by Hunter Spring Company as an inspector, at a salary of over $3,400.

3. Since 1944, and at their present residence since May 3, 1947, applicants have engaged in the business of raising mice for sale for use in pharmaceutical laboratories.

4. From 1947 to date the animals have been raised and kept until sale in a dilapidated one-car frame garage, of dimensions of about 12 by 16 feet, which is situated 11 feet from the extreme rear of the rear yard of the aforesaid premises. The animals are kept in numerous pens made of wood and metal screen which are placed on shelves in the garage.

5. Applicants have 660 female breeding mice and 110 male breeding mice. The females produce from 2 to 12 young approximately 6 times per year.

6. Applicants have bred and sold mice in years, numbers and values as follows:

| | | |
|---|---|---|
| 1951 | 19,249 | $2,975.21 |
| 1952 | 17,999 | 2,818.18 |
| 1953 | 13,739 | 2,273.59 |
| 1954 | 7,804 (plus 1,304 rats) | 1,789.77 |

The decrease in numbers of mice bred is accounted for in part by inbreeding, in part by marauding rats which have bored in through the woodwork.

7. Applicants have 312 female breeding rats and 104 male breeding rats. They sell between 75 and 100 rats weekly.

8. Most of applicants' animals are sold to Research Supply Company, Philadelphia, which in turn supplies them to hospitals and laboratories. This company has notified applicants that they must arrange to fill larger orders or else lose the company as a customer.

9. Each week the animals are removed from the pens, and the wood shavings and droppings from the pens are dumped into empty lettuce crates of which about a dozen are kept in the open outside of the garage. The shavings and droppings are removed weekly by a trash man.

10. Occasionally, as a result of this business, in warm weather or when the pens are wet, the neighbors have been annoyed by objectionable odors. The neighborhood is frequently subjected to industrial odors, particularly from a nearby asbestos plant.

11. In the care of the animals, 20 to 30 hours of labor per week are entailed, so that it would be impracticable for applicants to try by themselves to operate the business anywhere but at their residence.

12. Applicants filed an application for a variance with the Zoning Board of Adjustment of the Borough of North Wales so as to permit the construction of a one-story concrete block or cinder block building 22 feet in length, 18 feet in width and of a height varying between 8 feet 2 inches and 10 feet in the rear portion of their property 14 feet in front of the existing garage. The approximate cost of erection of the proposed building including plumbing and heating will be $3,000. The proposed structure will be ratproof and miceproof, will permit applicants to raise more animals and will enable applicants to store the crates containing offal in the existing structure, thereby reducing objectionable odors.

13. The board of adjustment granted the application subject to the conditions that (1) refuse and offal shall at all times be stored indoors, and (2) the only animals that applicants may raise and breed are laboratory mice and rats.

14. Applicants' total investment in building, materials, equipment and animals is $1,771 of which the investment in animals is $632.

15. Under the Zoning Ordinance of the Borough of North Wales approved February 22, 1950, applicants' property is in a "C" residential district. Commercial activities of the type undertaken by applicants are forbidden except insofar as they are legal as nonconforming uses. The area directly opposite applicants'

property and for some distance in each direction on Walnut Street is zoned industrial. Directly across the street from applicants' property there is a bus storage garage. Nearby are a garage housing outboard motors and motor boats, an automobile service station, body shop and metal fabrication plant.

16. The erection of the contemplated building will not have more than a slight detrimental effect, if any, upon the values of real estate in the immediate vicinity.

### Discussion

The appeal filed alleges (1) that the findings of the board of adjustment are not supported by the evidence; (2) that the prerequisites to the exercise of the power to grant a variance do not exist, and (3) that the decision of the board was "arbitrary, capricious, an abuse of discretion, contrary to law, and . . . in violation of the due process clause of the Constitution of the United States of America." It is unnecessary to consider the first contention at length. We have made findings of fact based upon evidence adduced in court. We note in passing that such findings vary in no essential from those made by the board.

The prerequisites to the granting of a variance are mentioned in section 901 of the zoning ordinance. This provides that the board may "authorize upon appeal in specific cases such variance from the terms of the ordinance as will not be contrary to public interest, where owing to special conditions a literal enforcement of the provisions of the ordinance will result in unnecessary hardship, and so that the spirit of the ordinance shall be observed and substantial justice done."

The quoted portion of this section is taken verbatim from the enabling Act of May 4, 1927, P. L. 519, section 3307, as amended by the Act of July 10, 1947, P. L. 1621, section 93, 53 PS §15211.7. In order to be entitled to a variance applicant must have reasons

which are " 'substantial, serious and compelling' ": Valicenti's Appeal, 298 Pa. 276, 283 (1929). The burden rests upon applicants to establish that they fulfill the conditions specified by the act and unless they do so, the board is powerless to grant a variance: Appeal of Lindquist, 364 Pa. 561 (1950); Borden Appeal, 369 Pa. 517 (1952).

From the testimony we are satisfied that the granting of this variance is not contrary to the public health, safety, morals or welfare. The occasional attraction of rodents into the neighborhood will be discouraged by the erection of a modern cement or cinder block structure. There is no evidence that the presence of the laboratory mice and rats has endangered the health of the community. Their escape evidently is rare and harmless in any event. Depending on weather conditions, there may be a slight unpleasant odor at present emanating from the offal and from moistened crates used to hold wood shavings and droppings. Although some increase in the number of mice and rats kept by applicants may be expected, in view of the regularity with which the excrement is removed and in view of the provisions being made for keeping same covered and dry, it seems likely that the odors will be less in the future than hitherto. Neighbors occasionally notice an odor. However, it has always been sporadic and it has never provoked a complaint on their part. Other industries in the neighborhood are far more annoying in this respect. In any event, if the conditions become a nuisance recourse may be had in equity to abate the same.

Another factor more or less of public interest is whether the allowance of a variance will adversely affect property values. The evidence was somewhat conflicting. However, applicants are already conducting their business as a nonconforming use. Any prospective purchaser of neighboring properties would

take subject thereto. The erection of a new and modern building to house the animals apparently would have but trifling effect on values of neighboring real estate. The industrial zoning and character of the real estate across the street from applicants' property have had such a profound effect on the value of the residences that minor commercial projects incidental to the residential properties play an inconsequential part in affecting the values.

Aesthetic considerations are entitled to at least passing comment. From photographs admitted in evidence it appears that the proposed structure will be far more attractive than an old garage or barn on the adjoining lot. Also, there will still be sufficient ground for a nice lawn and small garden in applicants' rear yard area.

Next will be considered whether special conditions have been shown, whereby unnecessary hardship will result from literal enforcement of the provisions of the ordinance. Mere hardship is not enough; there must be *unnecessary* hardship: Devereux Foundation, Inc. Zoning Case, 351 Pa. 478 (1945). Distress to the owner is a factor to be considered. The owners here are seeking to expand a part-time activity. However, this business has materially supplemented their gross income. The primary purchaser has given notice of intent to do business elsewhere unless a greater volume is obtainable. Conducting the business at any location other than at the residence of applicants is manifestly impracticable as well as uneconomic. Yancale et ux. v. Phila. Zoning Board, 68 D. & C. 233 (1949), cited by appellants, is clearly distinguishable. In that case the court sustained an appeal from the granting of a variance which permitted such expansion of a store as to do away with the required minimum depth of a rear yard and required total open area. The court stated that "in considering hardship the neighborhood must be considered too . . . the

neighbors' back yards will in effect be cut off by this addition." In the present case no effort is being made to dispense with setback or area requirements; the use and enjoyment of neighbors' houses and yards will not be affected adversely or limited in any way.

Finally, will the granting of a variance be in accordance with the spirit of the ordinance or will it improperly favor the owners of one lot and frustrate the intent and purpose of the borough council in adopting the ordinance? Council divided the borough into districts known as Class A, B or C residential, business and industrial. The establishment of lines of demarcation between such districts almost always causes some cries of anguish from a borderline property owner with a real or imagined grievance. Theoretically it might be ideal if there were some kind of buffer such as a park separating one class of district from another. In practice such arrangements are hardly ever made. The provisions for the granting of variances, in a more or less crude fashion, sometimes permit a blending from one class of district into another. Petitioners have a nonconforming use, the extension of which might ordinarily be denied, particularly if it were in the nature of an island completely surrounded by strictly residential ground. However, in this case, the property is situate on the extremity of a residential area more or less tormented by business and industrial establishments along the line of the Reading Railroad. Nearby are a body shop, gasoline station, bus garages and a metal fabrication plant. The houses in this neighborhood were constructed for lovely suburban living. Subsequent developments have altered the character of East Walnut Street, at least. Industrial fumes are more persistent and more annoying than the occasional odors from applicants' premises and even those odors should decrease, if the variance is granted.

Appellants contend that the chief reason the owners want more space is that in 1954 they embarked upon the venture of raising white rats commercially and that such activity requires more space than raising mice. Appellants argue that since the raising of rats does not even qualify as a nonconforming use, permission should not be granted to extend such a use. Whether the use be raising mice or raising rats, we consider it substantially the same for present purposes. Certainly the classification is the same. Even if the classification were considered different section 1112 of the ordinance would apply. This provides, inter alia, that "A nonconforming use of a building may be changed to another nonconforming use of the same or a more restricted classification. . . ."

Appellants also cite section 1110 of the ordinance in support of their point that the variance violates the spirit of the ordinance. This section provides that: "The uses of lands and buildings permitted by this Ordinance shall not be construed to include . . . any trade, occupation, industry or business whatsoever that is noxious or offensive by reason of causing . . . odor. . . ." Neither the municipality nor the court should lend sanction to a nuisance. It has not been established by the preponderance of the testimony that hitherto the operation of the business constituted a nuisance, although it occasionally caused some disagreeable odors.

Applicants represented at the hearing before the writer of this opinion that if they were granted the variance they would not increase the number of breeders, but they would only increase their saleable stock by reason of the better animal husbandry made possible in a new building. Under the circumstances, the representation should be incorporated as a condition of the grant of the variance. We are also of the opinion that the variance should be allowed only on

condition that the odor created by reason of applicants' business shall not exceed in frequency, duration or intensity the odors hitherto created by reason of said business.

By the use of metal receptacles with proper lids, by keeping the contents dry and away from extreme heat and by operating the business according to approved methods applicants may be able to avoid the commission of a nuisance and they should be able to comply with the following

### Order

And now, August 4, 1955, the decision of the Zoning Board of Adjustment of the Borough of North Wales, is affirmed, subject to the conditions recited therein and to the additional conditions (1) that no more than 660 female breeding mice, 110 male breeding mice, 312 female breeding rats and 104 male breeding rats shall be kept upon the premises and (2) that the odors created by reason of applicants' business shall not exceed in frequency, duration or intensity the odors hitherto created by reason of said business.

Exceptions to this decision and order may be filed within 20 days; otherwise this order shall become the final judgment of the court.